**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 1:15-cv-00307-F**

| | |
|---|---|
| In re CHANNELADVISOR CORPORATION Securities Litigation | CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**CONSOLIDATED AMENDED CLASS
ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Justin Dice ("Lead Plaintiff" or "Dice") and named plaintiff Faour Clement ("Named Plaintiff" and together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through undersigned counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by ChannelAdvisor Corporation ("ChannelAdvisor" or the "Company"), Company press releases, media and analyst reports about the Company, and interviews with former employees. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a Class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired ChannelAdvisor securities between November 6, 2014 and January 12, 2015, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b)

and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors. During the Class Period, Defendants disseminated false and misleading statements knowingly designed to inflate the price of ChannelAdvisor common stock artificially.

2. ChannelAdvisor offers a platform it developed and designed to assist its customers, retailers and manufacturers, to sell goods and services more effectively online. In essence, the Company's "software as a service" ("SaaS") platform enables customers to sell through hundreds of internet channels, simultaneously, while keeping precise track of pricing, inventory, sales and other critical information through sophisticated analytics that afford customer and Company visibility about what customers are selling to whom and when. As an SaaS product, customers do not pay for and take possession of the ChannelAdvisor's software. Rather, the Company earns revenue by taking a subscription fee – a percentage commission – on the gross merchandise value ("GMV") that customers process through its platform; the more GMV customers process through its platform, the more revenue the Company earns.

3. Every dollar of GMV, however, is not equal. The Company contracts with customers to pay both a fixed subscription fee and a variable subscription fee. A customer pays the fixed subscription fees, no matter what, committing to process a minimum amount of GMV through the Company's platform during the contract's term. Upon exceeding that minimum GMV during the contract term, the customer pays for all GMV thereafter at the variable subscription rate – a rate materially higher than the fixed rate.

4. All contracts have both a fixed and a variable component. Smaller customers, who are most often not as well capitalized or financed as larger customers, often choose a lower

fixed subscription to avoid upfront capital commitment while larger, more flush, customers enjoy a discount by committing to process more GMV through the Company's platform. All things being equal, the Company made more money on variable subscription fees. The problem it experienced no later than 2013 was "churn."

5. Churn is the turnover in customers, more precisely the loss in customers. It is more likely that smaller, less well-capitalized and financed retailers, for example, will either not survive or will be unable to continue paying to use the Company's platform. Through 2013, the Company had experienced a material problem with churn, overwhelmingly with smaller customers. Analysts and investors took note.

6. As a result, from at least 2013 on, the Company publicly and aggressively moved to remedy the churn problem by shifting its sales focus to larger customers. With that, however, came a shift to materially greater amounts of fixed subscription fees. Defendants reasoned that even with the discounts to larger customers that fixed subscription fees represented, with volume, stability and visibility, the Company would make up for the reduction in variable subscription fees. By the beginning of the Class Period, Defendants knew the difficult choice the Company faced: Smaller customers meant more lucrative variable subscription fees but problematic churn; larger customers meant far less churn but less lucrative fixed subscription fees. They had set the Company on the latter path, committed to it and touted it to analysts and investors – bigger customers were better.

7. As the Class Period began, Defendants knew three critical things. First, they knew of their decision to focus on larger customers and the resulting huge increase in fixed subscription fees. Second, they knew the Company executed far fewer new contracts during the

fourth quarter – the holiday season – because retailers were focused on sales, not on the Company's platform. That is, the customers that the Company started with in the beginning of the fourth quarter were, in all material respects, the customers it tracked and serviced during that quarter. Third, as the fourth quarter began, Defendants knew with great precision the breakdown in subscription fees, fixed versus variable, contract by contract and with respect to each contract – in detail and in real time – how much fixed subscription fee each customer had left before it began paying variable subscription fees. Together, the Company's precise knowledge of the contracts it had signed and the detailed information it and its customers receive from the platform enabled it to predict with material accuracy the revenues it would earn in the fourth quarter.

8. As the quarter began, however, Defendants faced several problems. CommerceHub, a well-capitalized subsidiary of the multi-billion dollar conglomerate Liberty Interactive, was on the prowl to acquire a company with a platform similar to ChannelAdvisor's to compliment its own. At the same time, Defendants faced a reckoning with their decision to focus on larger customers and to shift an overwhelming majority of its subscription fees to fixed. Rather than face that reckoning and in an attempt to raise the price of its stock to defend best against a possible acquisition, Defendants issued a revenue forecast for the fourth quarter, 2014, that they knew to be false. Based on, among other things, a "net bookings" metric they first discussed in making that forecast, Defendants projected a revenue of $25.6 million to $26.1 million as compared to $20.5 million during the same period the prior year.

9. On this revenue projection, ChannelAdvisor's stock price soared from a close of $12.20 per share on the day prior to the Class Period to a close the day after of $17.85 and a

Class Period high close of $21.95 per share. On January 12, 2015, Defendants disclosed that a revenue miss, having projected a 25%-27% increase over the fourth quarter of the prior year and having only achieved a 16% increase. On the news of the miss and Defendants' tortured explanation of the reasons for it, investors punished the stock sending it plummeting to a January 13, 2015 close of $9.83, down $11.32 from the January 12, 2015 close of $21.15, nearly a 54% decline. Purchasing shares during the Class Period, while the price was inflated artificially by means of Defendants' fraud, Plaintiffs and members of the Class were damaged as a direct result thereof.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

12. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred and Defendant ChannelAdvisor conducts business in this District.

13. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14. Lead Plaintiff Justin Dice, as set forth in the accompanying certification, incorporated by reference herein, purchased securities of ChannelAdvisor during the Class Period and has been damaged thereby.

15. Named Plaintiff Faour Clement, as set forth in the accompanying certification, incorporated by reference herein, purchased securities of ChannelAdvisor during the Class Period and has been damaged thereby.

16. Defendant ChannelAdvisor is organized under the laws of the Delaware and maintains principal executive offices at 2701 Aerial Center Parkway, Morrisville, NC. The Company's common stock is listed on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "ECOM".

17. Defendant Scot Wingo ("Wingo") was a co-founder of ChannelAdvisor and is, and was throughout the Class Period, ChannelAdvisor's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

18. Defendant David Spitz ("Spitz") is, and was throughout the Class Period, ChannelAdvisor's President and Chief Operating Officer ("COO").

19. Defendant John Baule ("Baule") is, and was throughout the Class Period, ChannelAdvisor's Chief Financial Officer ("CFO").

20. Defendants Wingo, Spitz, and Baule collectively are referred to herein as the "Individual Defendants." ChannelAdvisor and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

21. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of ChannelAdvisor's common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

22. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ChannelAdvisor securities and other publicly-traded securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ChannelAdvisor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23. Plaintiffs' claims are typical of the claims of the members of the Class as Defendants' wrongful conduct, in violation of the federal securities laws, affected each member of the Class similarly.

24. Plaintiffs will fairly and adequately protect the interests of the members of the Class.

25. Plaintiffs have selected counsel that will fairly and adequately represent the interests of the Class. On May 6, 2015, the United States District Court for the Southern District

of New York, per the Honorable Alison J. Nathan, appointed Lead Plaintiff and approved his selection of The Rosen Law Firm, P.A. ("Rosen Firm") as Lead Counsel. The Rosen Firm has done considerable work, indentifying and investigation potential claims on behalf of the Class. It has extensive experience handling class actions, in particular those alleging violations of the federal securities laws and has a firm grasp of applicable law. Last, the Rosen Firm has and is willing to commit resources necessary to prosecute this class action adequately. As such, the Rosen Firm will fairly and adequately represent the interests of the Class.

26. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws, as alleged herein;

(b) whether Defendants' relevant Class Period statements misrepresented material facts about the business, operations and management of ChannelAdvisor;

(c) whether Defendants omitted material facts they had a duty to disclose, thereby misrepresenting material facts about the business, operations and management of ChannelAdvisor; and

(d) whether and to what extent the members of the Class have sustained damages and the proper measure of damages.

27. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

***Background of ChannelAdvisor's Business***

28. According to the Company's Annual Report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"), filed with the SEC on February 27, 2014, it claims to be a "leading provider of SaaS solutions that enable [its] retailer and manufacturer customers to integrate, manage and optimize their merchandise sales across hundreds of online channels." E-commerce, the Company wrote, is an expanding global market, increasingly complex and fragmented. Sellers have at their disposal hundreds of sites through which they can sell. Gone are the days when sellers sold exclusively through their own website. Today, to attract customers, ChannelAdvisor stated, "many retailers and an increasing number of manufacturers sell their merchandise through multiple online channels, each with its own rules, requirements and specifications."

29. Third party marketplaces – which aggregate the products of many sellers – the use of mobile devices, search engines that compare prices, international sales, involving local consumer preferences and social networking have all added to the fragmentation and complexity of the e-commerce world. As the fragmentation and complexity compound, the Company wrote, sellers require solutions to "enable them to easily integrate their product offerings and inventory across multiple online channels." The Company touts its SaaS solutions as "offer[ing] customers several distinct advantages over traditional in-house models, known as on-premises solutions, including lower upfront and ongoing costs, faster speed of implementation and less reliance on

internal IT staff."

30. ChannelAdvisor purports to "enable [its] customers to connect with new and existing sources of demand for their products, including e-commerce marketplaces, such as eBay, Amazon, Newegg and Sears, search engines and comparison shopping websites, such as Google, Microsoft's Bing, and Nextag, and emerging channels, such as Facebook and Pinterest." Simply stated, using ChannelAdvisor's "suite of solutions," retailers can manage the products they sell across many different internet sales outlets. According to the Company, it "provides [its] customers with a single, integrated user interface to manage their product listings, inventory availability, pricing optimization, search terms, data analytics and other critical functions across these channels."

31. By providing its customers with its "proprietary cloud-based technology platform [that] delivers significant breadth, scalability and flexibility," in 2013, ChannelAdvisor assisted its retailer customers to process "approximately $4.4 billion in GMV[1] through our platform –" managing over 150 million SKUs[2] using the Company's cloud-based software. In 2013, the Company boasted 2,400 customers in diverse fields, representing 27% of the top 500 U.S. internet retailers, including "Ann Taylor, eBags.com, J&R Electronics and Jos. A. Bank Clothiers, as well as manufacturers of consumer goods, such as Dell, Dooney and Bourke, Lenovo, Sony and Under Armour." Its ten largest customers, however, represented no more than 6.9% of total revenues for that year and "[n]o single customer accounted for more than 2% of []

[1]"GMV" gross merchandise value or the total sales dollar value for merchandise sold through a particular marketplace over a certain time frame.

[2] "SKU" refers to a stock keeping unit, usually a series of numbers and/or letters for each item in a store or catalog, used for tracking inventory.

total revenue."

***ChannelAdvisor's Revenue Stream***

32. Retailers pay subscription fees for access to and usage of the Company's SaaS solutions for a specified contract term, "usually one year." The Company "believe[s] that [its] subscription fee pricing model aligns [its] interests with those of [its] customers." According to the 2013 10-K, "[a] portion of the subscription fee is typically fixed and is based on a specified minimum amount of GMV that a customer expects to process through [ChannelAdvisor's] platform." If the retailer processes more than the fixed amount of GMV through ChannelAdvisor's solutions, the Company wrote, "[t]he remaining portion of the subscription fee is variable and is based on a specified percentage of GMV processed through [its] platform in excess of the customer's specified minimum GMV amount." The Company further stated that, [i]n most cases, the specified percentage of excess GMV on which the variable portion of the subscription is based is fixed and does not vary depending on the amount of the excess." Simply stated, the Company charges customers a flat fee to sell a defined amount of GMV through its platform. When customers sell amounts above that defined GMV amount, the Company charges them a fixed percentage of the excess, typically higher than the fixed amount.

33. In essence the subscription fees are commissions, based on a percentage of the GMV that "core customers" – which the Company defines as all customers who subscribe to its solutions – process through the Company's platform. Occasionally, the Company and analysts refer to a "take rate" which is simply the commission ChannelAdvisor charges on the goods and services sold through its platform – the percentage of GMV to which ChannelAdvisor is entitled. Fixed subscription fees, according to Defendants, have a lower take rate (or commission) than

variable subscription fees. From late 2013 through the end of the Class Period, ChannelAdvisor purposefully sacrificed the higher take rates of variable subscription fees for more the stable, predictable streams of revenue that fixed subscription fees yield.

***ChannelAdvisor Increases Revenues on its Path to Profitability***

34. In the 2013 10-K, the Company touted its total revenue growth from $43.6 million in 2011 to $68 million in 2013, "a compound annual growth rate of 24.9%. Our revenue growth," the Company continued, "has been driven primarily by an increase in the number of core customers utilizing our solutions and an increase in the average revenue per core customer, as well as by an increase in the amount of our customers' GMV processed through our platform." In turn, the Company attributed the average revenue per core customer growth primarily to more transactions through its platform – more GMV – and secondarily to "modest overall increases in the percentage fees assessed on the fixed and variable portions of GMV" – an increase in the take rate. Moreover, and importantly, the Company indicated that the rise in average revenue per core customer was also attributable "to a general shift in our customer base toward a greater proportion of larger enterprise customers." According to the Company, its largest customers – its "enterprise customers" – "generally commit to a higher specified minimum amount of GMV per month, which results in a higher proportion of fixed subscription fees." The Company knew well before the Class Period that lower take rates accompanied the fixed subscription fees it was selling to its largest clients.

35. In the Company's Annual Report on Form 10-K for the period ended December 31, 2014 ("2014 10-K"), filed with the SEC on February 26, 2015, the Company essentially reiterated this disclosure, stating, "[w]e have grown our total revenue from $53.6 million for the

year ended December 31, 2012 to $84.9 million for the year ended December 31, 2014, a compound annual growth rate of 25.9%." The Company cited "an increase in the number of core customers utilizing our solutions and an increase in the average revenue per core customer, as well as by an increase in the amount of our customers' GMV processed through our platform" as the primary drivers of growth.

36. GMV was a critical measure for ChannelAdvisor from the sales process through billing and revenue recognition. Former Employee 1 ("FE1") was an E-Commerce Sales Representative for the Company from July through November, 2014. Some of his responsibilities included inquiries via phone on pre-qualified prospects to identify initial business opportunities. FE1 stated that all sales personnel classified prospective clients by their estimated GMV. During phone calls, prospective customers would provide their GMV history for Company sales personnel to classify the prospective customer as Mid-market, Senior Mid-market, or Enterprise customers. FE1 described "rules of engagement" regarding who was allowed to speak with certain classified customers, mostly based on experience and seniority. If an Inside sales representative learned that a prospective customer had a senior mid-market or larger GMV, FE1 described, they would immediately direct those calls to the appropriate sales person. FE1 further explained that prior to entering a contract, sales personnel would have to first qualify the prospective customer's GM. "You had to know what they made on a monthly basis to start to figure how much the fees would be," FE1 stated.

37. According to FE1, the Company was very "tight-knit." It was common for sales personnel, sales managers and upper management to discuss many things in the open. FE1 described that everyone was situated on the same floor, so it was easy to communicate

frequently. He also explained that the overall tracking of all bookings and contracts is easily accessible on the Company's in-house Salesforce platform. The Salesforce platform, FE1 stated, shows the pipeline and funnel of all bookings and contracts. He explained that he could go into the system and see how much revenue was generated from his leads, and a manager could easily pull up the results of a team to analyze those results. Senior management of the Company had access to and closely monitored the Salesforce platform given both the materiality of the information and the Company's stated selectively in acquiring larger and higher quality customers. Thus, Defendants had access to the GMV each client generated and the revenue the Company received therefrom.

38. In general, the Company stated in the 2013 10-K, it "invoice[s its] customers for the fixed portion of the subscription fee in advance, in monthly, quarterly, semi-annual or annual installments." It continued that "[f]ixed subscription and implementation fees that have been invoiced are initially recorded as deferred revenue and are generally recognized ratably over the contract term." As for variable subscription fees, the Company claimed to "invoice and recognize revenue from the variable portion of subscription fees in the period in which the related GMV is processed, assuming that the four conditions specified above have been met."

39. In the 2013 10-K, the Company further claimed to "use customized pricing structures for each of [its] customers depending upon the individual situation of the customer. For example, some customers may commit to a higher specified minimum GMV amount per month in exchange for a lower fixed percentage fee on that committed GMV." The Company billed anything beyond that committed minimum, or fixed subscription fee, as variable – "typically higher than the fee on the fixed, committed portion." The Company stated that

revenue fluctuation could occur on the same GMV, "depending on which customers generated the GMV." Counseling investors that GMV was not a "useful quantitative measure" for analyzing historical or predicting future revenues, Defendants noted that "changes in GMV from month to month for any individual customer that are below the specified minimum amount would have no effect on our revenue from that customer, and each customer may alternate between being over the committed amount or under it from month to month."

40. Also in the 2013 10-K, Defendants warned that because "a significant portion of the revenue [the Company] report[s] in each quarter is generated from customer agreements entered into during previous periods," the nature of its subscription fee arrangements might mask "a significant downturn in our business." Defendants continued that "a decline in new or renewed subscriptions in any one quarter may not be reflected in [its] financial performance in that quarter but might negatively affect our revenue in future quarters. Accordingly," Defendants concluded, "the effect of significant declines in sales and market acceptance of our solutions may not be reflected in our short-term results of operations." The Company warned, too, about the effect on a reduction in variable subscription fees could have on its financial results. "If sales by our customers processed through our platform were to decline, or if our customers were to demand fully fixed pricing terms that do not provide for any variability based on their GMV processed through our platform," the Company warned, "our revenue and margins could decline." These warnings, however, were meaningless as Defendants reported on and, therefore, had actual knowledge of the actual and pronounced shift in the Company's revenue mix to larger retailers and fixed subscriptions fees.

***Defendants Knew that the Company was Experiencing a Shift to Less Lucrative Fixed Subscription Fees***

41. This trend toward larger customers and the attendant increase in fixed subscription fees evolved from the Company's and analysts focus on "churn," in essence the cycle of loss and replacement of customers. High churn is negative. Smaller customers churn at a far higher rate than larger customers. As Defendant Wingo stated during the Company's May 5, 2014 earnings conference call for the quarter ended March 31, 2013 ("1Q2014 Earnings Call"), "[w]hile I see GMV continues to be concentrated among our largest customers, we put a number of processes in place that we expect to reduce churn rates, increase lifetime value, and ultimately drive sustainable growth at higher levels." Wingo continued, with the selectivity in new customer signings, the Company would "generate higher quality revenue growth while also realizing the leverage in our business model sooner. This focus on larger customers where we can deliver greater value," he concluded, "means we believe that the size of our average customer will continue to grow as will retention rates."

42. During the same earnings call, Defendant Spitz added that "customers at the lower end of the scale just have long-term viability challenges." Customers selling less than $100,000 a month through channels like eBay, he stated, have problems sourcing product and remaining well capitalized such that "they just don't have as long a lifespan as a larger customer." Through an "in depth" analysis Defendants conducted in early 2014 on the profitability, cost to customer acquisition and lifetime value of customers in the small retailer segment, Spitz continued, the Company had "decided that unless we significantly filter the type of customer that we bring on board in this segment, it's very difficult to show profitability on a unit basis down at the lower end." That is, for the most part, smaller customers were less

profitable. So, according to Spitz the Company had "tighten[ed its] customer acquisition policies and [its] customer acquisition strategy," to achieve revenue growth but also to understand "the revenue growth that ultimately can yield profit." Spitz concluded, "what we see at the lower end of the market, . . . statistically that the odds of success of that type of customer is low and it almost doesn't matter what we do, right. . . . [O]ur changes are really about not signing those customers at that stage in their lifecycle."

43. During the Company's August 4, 2014 earnings conference for the quarter ended June 30, 20143 ("2Q2014 Earnings Call"),[3] Defendant Spitz gave more color on churn, stating "we also saw an increase in customer unit churn at the lowest end of our customer base, on average, smaller sellers paying us less than $15,000 per year." Spitz continued that "[a]lthough the resulting lost revenue measured as a percentage of overall revenue was consistent with what we've seen over the last few years, more of it was concentrated in smaller customers and thus had a larger than usual impact on our net customer unit growth." About churn, Spitz concluded, "[w]e are seeing an uptick in churn at the low-end of our customer base whether a customer has been with us for five years or five months. So we do not believe this indicates any change in deal quality."

44. Defendants' antidote to the churn virus was to increase the Company's focus on attracting and booking larger customers. "Put simply," Spitz stated in the 2Q2014 Earnings Call, "in Q2, we lost an increased number of smaller customers and replaced them with larger and, we believe, more profitable customers, slowing our net customer growth compared to recent

---

[3] Present on this 2Q2014 Earning Call, for the Company, were Defendants Wingo, Spitz and Baule.

quarters. But, at the same time," he continued, "we saw our average revenue per customer growth increase year-over-year in Q2 when measured on a trailing three-month basis, the first sequential increase in trailing three-month average revenue per customer we've seen in a year." Defendant Spitz concluded, "Thus, the slowdown in net adds relative to last quarter was offset by an acceleration in average revenue per customer."

45. The numbers support Defendants' explanations. At the end of 2013, seven months before the start of the Class Period, the Company reported a three-year trend in increasing revenues from fixed subscription fees plus implementation fees and declining revenues from variable subscription fees. It reported that in 2011, 55% of its revenue was fixed, 45% variable. In 2012, 61.4% of its revenue was fixed, 38.6% variable. In 2013, 66.8% of its revenue was fixed, 33.2% variable. The trend was unmistakable and one that was a focus of the Company and analysts.

46. For example, about this shift to an ever greater percentage of fixed subscription fees, during the Company's February 6, 2014 earnings conference for the quarter and year ended December 31, 2013 ("4Q2013 Earnings Call"),[4] Defendant Baule stated, "[w]e also continue to see an upward trend in the fixed component of our subscription fees to 65% of total revenue in the fourth quarter of 2013, compared with 59% in the fourth quarter of 2012, a significant increase." He continued that "[s]equentially, the fixed percentage of revenue is down slightly from Q3 since holiday spending in the fourth quarter makes retailers more likely to exceed their subscribed monthly GMV threshold and to generate higher variable fees."

[4] Present on this 4Q2013 Earning Call, for the Company, were Defendants Wingo, Spitz and Baule.

47. This trend continued during the first quarter of 2014. According to the Company's Quarterly Report on Form 10-Q for the period ended March 31, 2014 ("First Quarter 10-Q"), filed with the SEC on May 5, 2014, 72.8% of revenues were from fixed subscription fees plus implementation costs, up from 65.3% in the same period of 2013. Variable subscription fees fell from 34.7% to 27.2% over the same period in 2013. Commenting about this trend during the 1Q2014 Earnings Call, Defendant Baule stated, "[a]lso worth noting, our fixed subscription revenue as a percent of total revenue increased to 73% in Q1 compared with 65% in the first quarter of 2013, as customers traded to higher GMV level[s] to better match their increase to online revenues."

48. The gap widened in the second quarter of 2014. According to the Company's Quarterly Report on Form 10-Q for the period ended June 30, 2014 ("Second Quarter 10-Q"), filed with the SEC on August 4, 2014, for the three-month period, 75.6% of revenues were from fixed subscription fees plus implementation costs, up from 67.5% in the same period of 2013. Variable subscription fees fell from 32.5% to 24.4% over the same period 2013. Commenting about this trend during the Company's 2Q2014 Earnings Call, Defendant Baule stated, "[w]e also saw continued expansion with our existing customers as they committed to higher monthly GMV levels." According to Baule, "[t]he fact that customers are buying up to higher tiers of service, is reflected in the continued upward progression of our fixed revenue, which climbed to 76% of total revenue compared with 68% in the same quarter last year."

49. And again, the gap widened in the third quarter of 2014. According to the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2014 ("Third Quarter 10-Q"), filed with the SEC on November 6, 2014, for the three-month period, 78.6% of

revenues were from fixed subscription fees plus implementation costs, up from 70.4% in the same period of 2013. Variable subscription fees fell from 29.6% to 21.4% over the same period in 2013. During the Company's November 6, 2014 earnings conference call for the period ended September 30, 2014 ("3Q2014 Earnings Call"),[5] once again, Defendants Baule commented on the overwhelming trend toward fixed revenue. He stated, "[a]s Scot and Dave had discussed, we saw growth in revenue attributable to both increasing customer count and increasing average revenue per customer. Our fixed subscription revenue increased to 79% of revenue in the third quarter compared with 70% in the same quarter last year." About this increase, Defendant Baule stated, "one contributing factor is that 71% of our trailing 12 month revenue is generated from customers who pay us above $30,000 a year in fixed subscription fees. These larger customers tend to have better GMV visibility and thus we are more willing to commit the higher fixed GMV thresholds."

50. This shift made perfect sense. According to Former Employee 2 ("FE2"), a Mid Market Sales Executive for the Company from May of 2013 until January of 2015 who reported directly to David Spain,[6] the Company created incentives for its sales force to push new and existing customers toward more fixed subscriptions. For example, FE2 stated that if a customer's GMV reached a certain amount, Company sales personnel would contact them to negotiate a higher fixed subscription fee. According to FE2, "[w]e were compensated on that, so more than happy to do it." Indeed, FE2 stated, the Company compensated the sales force for the fixed subscription fee portion of any contract but not for the variable subscription fees.

---

[5] Present on this 3Q2014 Earning Call, for the Company, were Defendants Wingo, Spitz and Baule.

[6] David Spain is the current Senior Mid Market Sales Manager at ChannelAdvisor.

Confirming FE1, FE2 stated that ChannelAdvisor tracked fixed and variable subscription fees via its Salesforce platform. He explained that it was easy to access sales information for every client, for every day, week, month or year. He added that it was real-time software and very easy to use.

51. FE2 further recalled that towards the end of his tenure, the word was out that the Company's strategy to prod customers to higher fixed subscription rates was not a good idea. FE2 recalled, "[i]t seemed like it [the information] was coming down from C level that it wasn't good for us. I remember that toward the end of my time in Q4ish but possibly before."

52. According to Former Employee 3 ("FE3") FE2's understanding of the shift to larger customers was wholly accurate. FE3 was a Global Project Manager for ChannelAdvisor from June until December of 2014. FE3 assisted with client services in the client on-boarding process, reporting to Mike Betsko, a Company Senior Team Manager, Onboarding.

53. FE3 explained that when he started working at the Company, it began shifting to larger clients because the platform was not having success with the smaller companies. ChannelAdvisor's platform, he said, was expensive for smaller companies and due to their lack of resources, it was a challenge for them to achieve expected or desired revenue using the Company's system. FE3 felt that ChannelAdvisor may have misrepresented its platform not "as a matter of transparency," but in creating false expectations. FE3 stated that ChannelAdvisor's platform was great tool that converted, when implemented, but that smaller companies did not have the adequate resources to make it cost effective. As a result, according to FE3, the Company lost a lot of clients. FE3 added, "[t]he model was not ideal [for smaller retailers] and it was expensive." FE3 recalled that customers were "blindsided" at times due to the product and

expectations not being articulated correctly.

54. According to FE3, some smaller customers realized that the platform was not cost effective at times, due to the agreed GMV revenue tier not being maximized or reached. FE3 compared it to a cellular phone service model, where a customer is given a certain amount of data for a specified fee and that fee was due every month, regardless of whether the maximum level of data was reached. Smaller retailers, according to FE3, therefore, were paying thousands of dollars each month to use a multiple channel platform, but did not gain significant revenue, or enough revenue to make that cost effective for the client. FE3 further stated that ChannelAdvisor catered to smaller businesses initially and then targeted bigger organizations later, which possibly led to eventually pricing smaller organizations out. FE3 recalled looking over numerous projects thinking the investment was not a good one for the client. He added, "Hence, why I'm no longer there."

55. Not only did Defendants know of this trend in minute detail, but they touted it. In the 2Q2014 Earnings Call, Defendant Spitz expressed the Company's belief "that over time, the low end of the market will continue to face fierce pressure among sellers as the competitive bar in e-commerce continues to rise. . . . GMV," Spitz continued, "will continue to migrate up the stack as the market evolves, and as we execute on our path towards profitability over the next two years to three years." Spitz further stated that the Company's "increased focus on and concentration of larger customers is likely to improve the leverage in our model and our overall prospects for profitability. . . ." As such, he concluded, ChannelAdvisor would, on occasion, "favor adding a smaller number of net larger customers in a period versus chasing a larger number of smaller, but ultimately less profitable customers."

56. Regarding Defendant Spitz's statement that '"fierce pressure" among small sellers will cause GMV "to migrate up the stack as the market evolves…," FE3 confirmed that it meant variable subscription fees would lag fixed fees even more as the shift of GMV to larger sellers occurred. Management knew that would occur.

57. According to Defendant Baule's presentation to the January 13, 2015 Needham Growth Conference, with respect to the shift from variable to fixed subscription fees, as "Customers continue to commit to larger amounts of GMV through our platform," there is "less opportunity for variable revenue," but customers "extend their relationships with ChannelAdvisor," leading to "increased visibility going forward." Defendants, themselves, therefore, directly linked the shift to larger customers with more fixed subscription fees to "increased visibility."

58. Thus, by the beginning of the Class Period, Defendants had actual knowledge that the contracts in which they had entered and the overall revenue trend was away from more lucrative variable subscription fees and to less lucrative fixed subscription fees.

***Defendants Knew of an Actual Shift to Fixed Subscription Fees before the Beginning of the Class Period***

59. For the Company's customers, the fourth quarter is the holiday shopping season. As FE3 stated, ChannelAdvisor's Christmas cycle would be in full swing by the end of October. "Almost all of Q4," he said, "is Christmas season for them." Given the focus on sales during this period, historically, the Company signed few new contracts in the fourth quarter. As Defendants stated during the 2013 annual results conference call on February 6, 2014, "Q4 has historically been a seasonally slow period for our sales team as many of our prospects are focused on the holiday selling period." In its pre-announcement conference call on January 12, 2015, Defendant

Spitz added, "our contracts are almost all auto renew, so they happen on a fairly continuous basis. It's certainly the case that some contracts get renegotiated at the point of an annual renewal cycle, but most of them just roll over."

60. By the end of the third quarter, 2014, therefore, Defendants had actual knowledge of the amount, in each contract, on which the Company would earn fixed subscription fees. That number remained static during the fourth quarter and did not materially change. The Company confirmed this by reference to its actual customer numbers. In the First Quarter 10-Q, the Company boasted over 2,500 core customers, worldwide, as of March 31, 2104. In the Second Quarter 10-Q, the Company boasted over 2,600 core customers, worldwide as of June 30, 2014. In the Third Quarter 10-Q, the Company boasted "approximately 2,800 core customers worldwide including 32% of the top 500 U.S. internet retailers. . . ." In the 2014 10-K, however, the Company stated that it "had over 2,800 customers worldwide, including 32% of the top 500 U.S. internet retailers. . . ."

61. More than the complete vision it had on the shift to larger customers and attendant fixed subscription fees, the Company boasted of the analytics its platform provided to it and to its customers that gave it precise visibility into its customers and their patterns of online sales. For example, Defendants touted ChannelAdvisor's inventory and order management system, "a single, unified platform for our customers to upload and modify their product catalog data, monitor inventory stock levels and create a single inventory feed that serves multiple available online channels." Critically, Defendants stated that "inventory and order data is the foundation for much of the customer activity on our platform." Moreover, according to Defendants, the inventory management "system is capable of scaling across thousands of customers during

critical selling periods, such as the year-end holiday season." As this was an SaaS platform to which customers never took access, Defendants, too, had instant access to all of this information.

62. Defendants also boasted a proprietary reporting and analytics platform, "allow[ing] our customers to view general product performance and trends affecting their consumer base across multiple channels and to obtain detailed performance data at a channel or SKU level that can be used in a particular online sales campaign." Defendants continued that ChannelAdvisor's "dashboards highlight sales trends, top performing products, seller reputation and repricing activity, among other key performance indicators. The dashboards also alert customers to issues or errors, such as data that is in a form inconsistent with the requirements of a particular channel." Defendants concluded that "[t]hese capabilities provide actionable insights that allow customers to revise their business rules and listings on a real-time basis with the goal of improving their sales and profitability."

63. Defendants knew, therefore, in real time, selling patterns and inventory for sale online of its customers, including in the holiday season, and knew the fixed subscription fee portion of each contract and how much GMV each customer had to pass through the platform to surpass the fixed fee portion of their contracts. With all of this data, Defendants had precise information on the Company's revenue stream for the fourth quarter.

64. Defendants knew, too, that the Company would not and did not add a material number of new customers in the fourth quarter that clouded its ability to forecast revenue or skewed its calculations of fixed subscription fees versus variable. As such, Defendants knew of the shift to fixed subscription fees, they knew of the shift in GMV to larger customers, and that knowledge afforded them clear visibility on revenues for the fourth quarter of 2014.

**Defendants' False and Misleading Class Period Statements**

65. The Class Period begins on November 6, 2014, when, after the close of trading, the Company issued a press release announcing its financial results for the third quarter of 2014 and guidance for the fourth quarter and full year of 2014. In the press release, Defendants forecasted fourth quarter, 2014, total revenue of between $25.6 million and $26.1 million and a narrowing adjusted EBITDA loss of between $(0.7) million and $(0.1) million. For the full year, Defendants predicted total revenue of between $86.7 million and $87.2 million, with an adjusted EBITDA loss of between $(18.7) million and $(18.1).

66. On the same day, during the 3Q2014 Earnings Call, Defendant Baule reiterated the Company's revenue guidance for the fourth quarter of 2014 and stated, "Looking ahead to the fourth quarter, we are anticipating revenue of $25.6 million to $26.1 million. . . ." Defendant Spitz stated that the Company "saw rapid growth in [its] base of large customers." Indeed, he stated, the Company saw "the greatest expansion in [its] larger customers." With respect to marketing and sales, Spitz continued that the Company "invested quite a lot in marketing over the last year, one of the objectives being to increase our brand visibility and brand awareness amongst large retailers and now with the acquisition of E-Tale, increasingly towards brands and manufacturers as well."

67. With respect to key operating metrics, Spitz discussed the quarter's highlights. The Company, he stated, "saw a rapid growth in our base of large customers. . . [saw] improvements in [its] sales productivity, resulting in improved leverage in our P&L . . . generated strong growth in bookings from existing customers," enhanced revenue visibility "due to a 41% increase in fixed subscription revenue compared to the third quarter 2013, [a]nd"

maintained strong revenue retention.

68. During the 3Q2014 Earnings Call, in discussing the third quarter results and their projections for the fourth quarter and 2015, Defendants promoted this movement of GMV to larger customers. According to Defendants Spitz, it was "notable" that ChannelAdvisor "continue[d] to see the greatest expansion in our larger customer segments. For instance our fastest growing segment of new customers in the third quarter was those whom we expect will generate between $60,000 and $100,000 in annual revenue with net adds in this segment more than doubling from a year ago." Spitz then encouraged analysts not to rely on the number of customers added as a meaningful metric because of the disparity in size and quality of customers.

69. Instead, Spitz advanced "net bookings," among the metrics that Defendants "look at in developing [their] revenue growth projections. Net bookings," Spitz stated, "measures the incremental annual contract value, or ACV, added during a period and subtracts the trailing 12-month revenue loss from contract terminations, also known as revenue churn." Defendants measured the inputs to this metric on a trailing twelve month basis "to smooth out seasonality." Again, according to Spitz, Defendants have "historically found net bookings as a percentage of trailing 12-month revenue to be highly correlated with revenue growth in the following subsequent 12 months." Spitz told analysts that net bookings for at the end of the third quarter were 28%, supporting Defendants' view for continued growth around that level. Spitz concluded that net-bookings correlated with revenue growth, giving Defendants confidence in their revenue projections.

70. Spitz also gave relevant color on ChannelAdvisor's "churn." Over the past three years, Spitz stated, the Company saw 14%-16% churn, as a percentage of its total revenue. "We

never like to lose a customer and we make every effort to retain[] them all," Spitz asserted, but the Company's "customers operate in a highly competitive environment and not everyone survives regardless of the platform they use. It is also worth noting that the majority of our churn comes from our least tenured and smallest customers." Spitz provided important statistics relating to churn that provided Defendants with even more clarity on their fourth quarter revenue projections. According to Spitz, "[o]nce a customer reaches their second year with us they are much less likely to terminate in the future. To illustrate the contrast between customer and revenue churn," Spitz continued, "72% of the customers we lost over the last 12 months were customers whose trailing 12 months revenue to us was less than $15,000, whereas customers in that segment made up just a 11% of our overall revenue in that same period." Contrasting smaller customers and larger ones, Spitz continued, "[s]mall customers typically make up the majority of our churn on a net customer account basis but account for a much small proportion of our overall revenue." On the other hand, Spitz divulged, "customers whose annual revenue to us exceeds $100,000 experience revenue churn well below 10%."

71. In rounding his remarks about churn, Spitz stated that "[c]ustomers are simply not all equal in terms of revenue and this is why we prefer to focus internally on revenue dollar retention versus customer count." He concluded, stating, "this additional information concerning net dollar bookings should help investors better understand our growth dynamics and hopefully provide increased confidence in our ability to drive continued strong revenue growth in 2015."

72. The true facts, which were known by Defendants, but concealed from the investing public during the Class Period, were as follows:

(a) Defendants knew of and had accurate visibility on the revenue breakdown of fixed subscription fees versus variable subscription fees from each customer as the Company entered the fourth quarter. For almost all of the Company's contracts with customers, Defendants knew what GMV each customer would process through its platform before it breached the fixed Subscription ceiling and began paying variable subscription fees.

(b) Defendants knew, too, that in an effort to convince investors that it had controlled its customer churn problem, the Company had solicited and sold its SaaS platform to far larger customers who contracted for higher fixed subscription fees that they received at a discount to the variable fees smaller customers often paid and the attendant lower take for those customers; and

(c) Prior to the start of the fourth quarter, Defendants knew of the trend toward larger clients with contracts more heavily weighted toward less lucrative fixed subscription revenues and knew, with precision, the details of each customer's contract provisions and GMV moving through the Company's platform. As such, by November 6, 2014, Defendants knew that their revenue forecast for the fourth quarter and for fiscal 2015 was materially false and misleading.

73. Also on November 6, 2014, the Company filed with the SEC its Quarterly Report on Form 10-K for the quarter ended September 30, 2014. In the 10-K, Defendants repeated the risk disclosure from the 2013 10-K, stating, "[w]e have adopted a pricing model under which a portion of the subscription fees we receive from our customers is variable, based on the amount of our customers' GMV processed through our platform that exceeds a specified amount established by contract, which we refer to as variable subscription fees." Defendants continued

that "[s]ubstantially all of [the Company's] customer contracts include this variable subscription fee component." The Company concluded, warning that "[i]f sales by our customers processed through our platform were to decline, or if our customers were to demand fully fixed pricing terms that do not provide for any variability based on their GMV processed through our platform, our revenue and margins could decline."

74. The foregoing warning was false and misleading when made because Defendants already knew, with precision, that the Company was focusing on larger customers who provided a majority of the GMV that transacted over its platform. Defendants knew, too, that with that shift came an attendant shift to fixed subscription fees that provided a lower take rate and, hence less revenue.

75. Analysts approved of the Company's third quarter results and its guidance for the fourth quarter of 2014 and its annual guidance for 2015. For example, on November 7, 2014, BMO Capital Markets analyst Joel P. Fishbein, Jr. published a research report titled, "New Metrics Should Stem Negative Sentiment" and rating ChannelAdvisor "market perform."[7] Fishbein noted that in quarters past, the Company had been plagued by customer churn, in essence, the failure of customers to renew ChannelAdvisor's services. According to Fishbein, "ChannelAdvisor's 3Q adequately addressed issues surrounding the sustainability of top-line growth, dollar-based churn, and its march toward profitability, which should improve sentiment. . . . New metrics disclosures," he continued, "highlight traction in larger customers. After last quarter's uptick in customer churn, new metrics were disclosed that give us more comfort in dollar renewals."

[7] According to BMO Capital Markets, the "market perform" rating is the equivalent to a recommendation to "hold" the stock.

76. Fishbein discussed that customer churn was, in large part, a problem from customers whose annual spend was less that $15,000. Praising the Company's shift to large clients, Fishbein noted that of 108 customer additions in the third quarter, the number of new customers that spend between $60,000 to $100,000 doubled, year over year. "This mix of customer additions at the high end," Fishbein stated, "should continue to have a positive impact on churn (customers that spend over $100K churn at less than 10%), ARPU (+4.2% y/y), and increase visibility (fixed subscription +44% y/y to 79% of the mix)."[8]

77. On November 7, 2014, Deutsche Bank Markets Research analyst Karl Keirstead published a report, titled "Solid Metrics Should Alleviate Fears" and rating ChannelAdvisor a "buy." According to Keirstead, the Company "sent a strong message that underlying dollar bookings remain healthy even though net customer adds have slowed." He described management's ratio of net bookings over the proceeding twelve months to net core revenue in the third quarter was 28%. Keirstead conveyed Defendants' belief that this healthy ratio "indicat[ed] stable bookings" and provided "a rough indicator for forward revenue growth. The path to profitability," he concluded" is also clearer and ECOM doubled the net adds from customers expected to generate between $60k - $100k in annual revenues."

78. Also on November 7, 2014, Janney Capital Markets analyst Shawn Milne published a report titled, "Q3 Shows Stability/Leverage; FY15 Outlook Remains Strong on Bookings" and rated ChannelAdvisor a "buy." According to Milne, the Company's revenue guidance for the fourth quarter of 2014 of $25.6 million to $26.1 million "is slightly conservative – baking in core revenue growth in the 28% range with potential for slightly improved eBay SSS

[8] "ARPU" is average revenue per user. "y/y" is year-over-year.

into Holiday." About the clear shift to larger customers, Milne wrote, "[w]e would expect the addition of larger customers to drive stronger ARPU in our model including a recent July price increase – offsetting slightly lower" net additional bookings for the quarter.

79. On November 10, 2014, William Blair analyst, Justin Furby, published a report titled, "Beat-and-Raise Quarter Highlighted by Key Metrics Disclosure" and rating ChannelAdvisor "outperform."[9] While noting a decline in net customer additions in 2014, the Company allayed Furby's concerns with its fresh metric, indicating that "bookings performance—net of churn—remains rather healthy, and that the size of customers being added are of higher quality." The Company, Furby wrote, primarily lost low end customers, those that generate less than $15,000 in ARPU. It added retailers expected to generate $60,000-$100,000 in ARPU at double the rate of the third quarter of 2013. As an overwhelming percent of customer churn was attributable to the smallest customers, Furby predicted less churn "as the customer mix shifts toward more enterprise customers."

80. As a result of the foregoing, Defendants caused ChannelAdvisor's stock price to inflate artificially. Over the next two trading days, the Company's stock price rose from a November 6, 2014 close of $12.20 per share to a November 7, 2014 close at $17.85 on unusually high volume of over 2.7 million shares traded and a November 10, 2014 close of $18.34. As the Class Period wore on, the stock traded as high as $22.47 with a close, on that day, of $21.95.

81. During the Class Period – which spanned the critical holiday season for ChannelAdvisor and its customers – in addition to the information it had on the breakdown of subscription fees in each and every contract, Defendants also possessed, analyzed and disclosed

[9] William Blair equates its outperform rating to a "buy" recommendation.

precise information on GMV through particular channels. On December 3, 2014, the Company issued a press release touting year over year increases in "same store sales" ("SSS"). According to the Company, its "customers' same-store sales (SSS) increased 20.6 percent year-over-year during the five days from Thanksgiving through Cyber Monday — the Cyber Five. ChannelAdvisor customers grew their SSS 23.8 percent on Amazon, 20.6 percent on eBay and 54.4 percent on third-party marketplaces." Additionally, SSS on paid search channels like Google and Bing increased 19.1 percent year over year.

82. The press release quoted Defendant Wingo as stating that ChannelAdvisor's customers "are celebrating a successful Cyber Five that exceeded industry forecasts by nearly 5 percent." Wingo promised that the Company would continue watching the channels to determine whether "this growth remains steady through December or drops because consumers finished their shopping at the front end of the holiday season."

**<u>The Truth Emerges</u>**

83. On January 12, 2015, the Company issued a press release, titled "ChannelAdvisor Announces Preliminary Fourth Quarter 2014 Revenue Results," announcing that it had fallen short of its revenue guidance for the fourth quarter of 2014. It states in relevant part:

> Based on information available as of the date of this release, ChannelAdvisor expects revenue for the fourth quarter of 2014 to be approximately $23.7 million, compared to the prior guidance of revenue in the range of $25.6 to $26.1 million. These results are preliminary and unaudited and are subject to change based on the completion of the company's normal quarter and year-end review process. As a result, these preliminary results may be different from the actual results that will be reflected in ChannelAdvisor's consolidated financial statements for the quarter ended December 31, 2014 when they are released.
>
> "We are disappointed that the fourth quarter did not meet our

> guidance. We saw an unusual shift of gross merchandise volume (GMV) to larger customers this holiday season at the expense of smaller customers. Because larger customers enjoy volume discounts in the form of lower take rates, this shift translated to lower variable subscription revenue, even though overall GMV increased 31% year over year for the fourth quarter," said Scot Wingo, CEO of ChannelAdvisor. "This resulted in fixed subscription revenue for the fourth quarter growing approximately 27% while variable subscription revenue decreased approximately 5% compared to a year ago. Despite this, we believe our fundamental value proposition, position in the market, and opportunities for continued growth remain intact. As fixed subscriptions grow as a percentage of overall revenue, we expect our overall visibility to improve as we look to continued growth in 2015. I want to emphasize that these financial results are preliminary and subject to change based on the completion of our normal quarter-end review process. We will provide additional financial details and customary metrics on our quarterly earnings call scheduled for February 5."

84. On January 12, 2015, the Company convened a conference call with analysts, reiterating the problems it highlighted in its press release of that day. According to Defendant Spitz, "revenue came in below expectations despite strong growth in GMV during the fourth quarter. Spitz blamed the shortfall on two causes. First, during the quarter, he claimed, GMV shifted to larger customers who benefit from "volume discounts," and, shockingly, "an increased proportion of fixed revenue [] muted our variable revenue upside in the fourth quarter."

85. Explaining further, after glossing over that GMV through the Company's platform grew by a healthy 31% in the fourth quarter, year-over-year, Spitz stated "our transaction volume and the use of our platform continued to be robust, and enjoy growth rates consistent with recent quarters." During the fourth quarter, however, Spitz continued, the Company experienced "significant growth in GMV at the upper end of our customer base, where take rates tend to be lower due to volume discounts, while smaller customers who generally have

higher take rates generated lower GMV growth." Notwithstanding that the Company had been purposefully moving its business toward enterprise customers, Spitz feigned surprise that the shift in GMV toward those customers "was consistent with the broader e-commerce market in which retailers above $30 million in online sales grew over 30% in the fourth quarter, while those with less than $2 million in online sales only saw single-digit growth according to comScore." Spitz concluded that "[t]his impact is perhaps amplified in our case due to concentration of eBay GMV, which as our same-store sales data showed was fairly weak during the fourth quarter compared to other channels, and we know that eBay tends to skew towards smaller customers."

86. Defendants, however, knew this going into the fourth quarter, well before the beginning of the Class Period. In the 2Q2014 Earnings call, Defendant Wingo stated, "eBay had a challenging quarter facing the one-two punch of a Google SEO action and a data breach. This caused eBay's growth to slow to 7% to 8% for the quarter, half the rate of e-commerce." Wingo continued that "[w]hile [ChannelAdvisor's] same-store sales came in above that, it was definitely a tough quarter for eBay, and we're watching carefully to see how they recover from both of these headwinds." eBay compounded that problem with its determination to "significantly raise the bar on their sellers which has resulted in more suspensions and limitations being imposed than we have seen historically."

87. During the 3Q2014 Earnings Call, Spitz again called attention to the eBay issue. "In a period where as we talked about, we see increased competition at the low end and eBay and Amazon kind of raising the quality bar," Spitz stated, "you could see pressure on those smaller customers. But as I indicated in my prepared remarks, the vast majority of our customer churn is

very, very small customers for us who collectively represent a small minority of our overall revenue."

88. Thus, not only did defendants know that the Company was turning its customer base toward larger sellers, but that eBay – through which many of the Company's remaining smaller customers sold – was having problems of its own, putting downward pressure on GMV through that channel. This was no surprise to Defendants.

89. Spitz concluded his January 12 remarks, stating "[i]n short, more of our GMV was captured in lower take rate but fixed revenue, versus higher take rate variable revenue in the fourth quarter. The impact of both of these drivers was amplified in the fourth quarter by the seasonal increase in GMV during the holidays."

90. During the January 12 conference call, Defendant Baule blamed the shortfall on "an accelerating trend towards greater GMV concentration among our largest customers, and a continued progression towards greater fixed revenue relative to variable revenue. While we expect these trends to benefit us over the long-term from the standpoint of revenue visibility," he continued, "it means that we will see less variable revenue from customers exceeding their GMV commitments, which has a negative impact on total revenue." Fixed subscription fees, he reported rose 27% over the fourth quarter of 2013 while variable fell 5%. "We had an unexpected shift in Q4 of GMV from smaller customers to larger customers," Baule stated. "If you look at the top 16th of our customers," he described, "they went from 46% to 52% of our GMV, and those guys will tend to have a lower take rate, both fixed take rate, and they pay less variable. So it has an impact on both."

91. Believing they understood the Company's metrics, analysts were unpersuaded that the revenue shortfall was unexpected. Goldman Sachs analyst Greg Dunham stated, "if I think about some of the dynamics here, the large companies or large customers, GMV growth actually improved, or even mid-sized companies, where they were committing to higher thresholds, so those are both positive surprises in many respects." Dunham continued, asking "did the lower end and mid market customers, many of which maybe you signed in the last year, did they not materialize as you expected? What really changed? What really surprised you?"

92. Defendant Baule responded, claiming that "[t]he single factor . . . is the GMV mix surprise. We saw a heightened shift in mix towards larger customers who pay lower take rate on their GMV, 46% to 52% is much different, and truthfully very different than what we've seen historically." Baule concluded that "it was just a mix shift that occurred in the fourth quarter."

93. Goldman's Dunham followed up asking, "Asked another way, you have added like 750 customers in the last 18 months or something like that. How have those customers performed relative to your expectations?"

94. This time, Defendant Spitz answered, stating, "it depends on how you look at it. If you look at it from a GMV perspective, they're growing, and generally speaking, growing at an aggregate, a healthy rate, which is why you see the GMV transaction volume that we're seeing." Spitz continued ChannelAdvisor was seeking "a movement from, in terms of consumer behavior towards the more trusted brand names, branded manufacturers . . . leading ultimately to a shift in GMV. So those smaller sellers who are dependent potentially on eBay or Amazon, who don't have a brand name associated with it," Spitz stated, "I think it's increasingly difficult for those types of sellers to grow at the rate of e-commerce, or certainly faster than the rate of e-

commerce." This was a prevarication. By the beginning of the Class Period, the Company knew that it was moving GMV rapidly toward larger, "enterprise" sellers, knew that those customers had more to spend, knew that those customers were far more likely to renew contracts and so consciously sought out those customers.

95. Unsatisfied, William Blair analyst Justin Furby followed up about renewals that increase fixed subscription fee amounts. "If that impacts you so negatively," Furby asked, "why even do that? I mean, why go -- if you feel good about your product, and that they are going to renew anyway, why would you let them do that, if they're going to get the incremental benefit from a rate perspective?" Furby concluded, commenting, "I understand visibility is important, but at the end of the day, you are losing dollars when you do that, it seems like."

96. In response, Defendant Wingo stated, ". . . that is a keen observation, and this is something that became, I think, apparent to us as we were digging in." Referring to Defendant Baule's comments on analysis of pricing policies, Wingo continued, "[t]he customers sometimes negotiate as part of their contract the right to switch tiers during the course of their contract. But in many cases, it's not something that's necessarily contractually required. So that is something that we are looking at, and may change our posture on."

97. Expressing the struggle he was having with Defendants and referring to Goldman analyst Dunham's question, Furby pressed Defendants, stating "investors should be getting excited about enterprise. I think for me, that is the more exciting market. And here we have a quarter where it seems like a great enterprise quarter, and yet growth decelerates by more than 10 points." Furby concluded, "I am just trying, I guess, to rack my brain, why such a good enterprise quarter? Should we or should we not be excited about the fact that your enterprise

business is growing leaps and bounds over mid market, given what we just saw play out in Q4?"

98. Defendant Wingo responded, claiming the shift "kind of popped in Q4 . . . going from as I indicated, 46% of GMV to the top 16th of our customer base to 52%." The Company, he answered, would "have to see if that is a step function, and now from Q1 onward, it stays at that level." Offering an alternative, Wingo proposed that maybe consumers "had experiences last holiday where products didn't get delivered on time. So maybe that caused more customers during the holidays to shift more towards more known names, and maybe it comes back down in Q1." He claimed not to know but that "more broadly, it gets to a question about pricing." He continued that in speaking "about previous pricing changes and things that we have done, more often than not, it has been focused at the lower end of our pricing scale, as we seek to move up market, and essentially price the very smallest types of customers out of reach of the platform." The Company Wingo claimed, however, had "not spent as much time analyzing what we think the appropriate yield curve looks like for enterprise type customers." He continued further that the Company must review "the entire curve as we go into this year, and figure out if the spread from – as you progress along the GMV tiers, if the spread is appropriate, or if we need to tighten the spread a little bit, and pull up some of those take rates." Wingo concluded, "[t]hat is something we are going to be focused on fairly keenly."

99. Pacific Crest Securities analyst Chad Bartley followed up, yet again, asking "just from a timing of events perspective, I think you reported Q3 on November 6, and that's when you gave your initial 2015 outlook." He queried, "[s]o after that point, were you more surprised by consumer behavior and concentration of GMV, or were you more surprised on the customer contract and renewal side of things?"

100. Defendant Baule responded that "[t]he biggest surprise was the concentration of GMV which hadn't – largely hadn't occurred in – at the time we gave that guidance. We didn't expect – we did not expect the trend towards increased GMV concentration among biggest customers, that mix issue to materialize." He continued, claiming that if Defendants had expected the purported trends, "obviously we would have – in retrospect, we would have modeled it in. But we did not expect that. That's the biggest thing." With respect to adjustment to fixed subscription fees, Baule stated that Defendants did not "fully appreciate[] the impact that some of our – how aggressively some of our customers would go towards greater fixed amounts and greater tiers." The Company, he claimed, had "generally accepted it, as sort of all positive when a customer wants to trade up to higher tiers, part of that land grab thing that I talked about. But obviously," he concluded, "there are nuances to it."

101. Stiefel Nicolaus analyst Brad Reback followed up, again, asking, "Can you guys break out roughly what percent of the miss was on the GMV side, and what percent of the miss was the fixed side?"

102. Pointing to the overall take rate, Defendant Baule responded, "[f]orget whether it's fixed or variable decline, because more of our GMV was going through larger customers who pay an absolute smaller amount." Then, he continued, "when you look at the sequential decline in fixed revenue growth, that is more attributable to, again that shift to bigger customers who just have -- they have lower take rates, not just on the fixed and variable, but on the fixed alone. I mean," he concluded, "a really big customer might have negotiated quite a low fixed rate, relative to a small customer."

103. Still unsatisfied, Reback probed further, asking "I am a little confused on the fixed side. Given that 4Q you don't do a lot of business, there couldn't have been a lot of big renewal activity in 4Q, especially in the final six weeks of 4Q. So when did this really start to happen?"

104. Defendant Spitz responded that almost all customer contracts renew automatically and renewal occurs "on a fairly continuous basis. It's certainly the case that some contracts get renegotiated at the point of an annual renewal cycle, but most of them just rollover. So when you ask, when did this happen, are you referring to the shift?" After Reback answered, "Yes," Spitz continued stammering that "it's hard to pinpoint." He stated, "[w]e talked about something on the order of a couple hundred customers shifting, and it appeared over a period of time." This, Spitz claimed, prevented him from "point[ing] to any particular point in time where suddenly ex percent more of customers were – moved from one type of contract to another." Incredibly, he concluded, "it's just something that built up, and in the analysis and retrospect, it became clear that what – that was a contributing factor."

105. Reback followed up, once again, asking "And final question, what types of controls and procedures need to be put in place to make sure something like this doesn't roll up, and sneak up on you again?"

106. Defendant Baule responded that ChannelAdvisor had "already changed [its] policy around how we approach some of these, and what the approval flows need to be. And I think that as part of our broader pricing and policy review, this is one of the things that's going to flow in there." After having described this shift to larger customers and greater percentages of fixed subscription fees over the course of the last year Baule stated, "to be very clear, there are

certainly times where it makes sense for a customer especially on an annual renewal cycle, if they are growing significantly, and they want to trade to a favorable tier in the long run, that's generally something that we want to see." He then equivocated, claiming that Defendants "need[ed] to make sure that the progression of those tiers . . . makes sense, and that we are not -- essentially through our own pricing matrix, having excessive volume discounting for a nominal growth in GMV." In a complete reversal, Baule concluded, "But I think part of what we will do and have already done, is tighten the requirements for when and how we allow customers to upgrade tiers for sure."

107. On this news, on January 13, 2015, shares of ChannelAdvisor fell $11.32 per share or more than 53% from its January 12, 2015 close of $21.15 to close at $9.83 per share on January 13, 2015, on relatively enormous volume of 9,496,200 shares traded, thereby damaging investors.

108. On January 12, 2015, BMO Capital analyst Joel Fishbein wrote that ChannelAdvisor's fourth quarter revenue shortfall was "disappointing in light of strong 4Q holiday sales (31% reported GMV growth) and 3Q's new disclosure of its bookings visibility metric." At revenues of $23.7 million, the Company's growth rate fell to 16% versus its forecast of 26% year over year growth. Fishbein maintained his market perform rating, stating, "[w]e expect shares to be under pressure until investors gain further clarity on the underlying growth and profitability of the business, which is expected on the company's 2/5/15 earnings call."

**Additional Scienter Allegations**

109. As alleged herein, ChannelAdvisor and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the

name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding ChannelAdvisor, their control over, and/or receipt and/or modification of ChannelAdvisor's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning ChannelAdvisor, participated in the fraudulent scheme alleged herein.

110. In addition, fear of a takeover likely motivated Defendants to disseminate false and misleading statements in an effort to inflate the price of ChannelAdvisor common stock to thwart a potential takeover. In the 2013 10-K, the Company warned that "We face intense competition in the market for online channel management solutions and services, and we expect competition to intensify in the future. Increased competition," Defendants stated in the 2013 10-K, "may result in reduced pricing for our solutions, longer sales cycles or a decrease in our market share, any of which could negatively affect our revenue and future operating results and our ability to grow our business."

111. Defendants noted that cooperative relationships among competitors or with third parties may enable competitors to "enhance their products and expand their markets." Moreover, the Company concluded, "consolidation in our industry is likely to intensify. Accordingly, new competitors or alliances among competitors may emerge and rapidly acquire significant market share." Defendants were, therefore, acutely aware of the possibility of a takeover.

112. Prior to the start of the Class Period, ChannelAdvisor had lost value and would have been relatively inexpensive to purchase. As William Blair analyst Justin Furby wrote in his November 10, 2014 research report, ChannelAdvisor's third quarter "results, coupled with record bookings, solid fourth quarter guidance, a first look into 2015 . . . that was likely above investors' lowered expectations, and the disclosure of certain key metrics, had the stock up 46% on Friday." Furby continued, noting that the rise in the Company's shares after its announcement of third quarter 2014 results and fourth quarter 2014 guidance still did not offset the drop after the announcement of second quarter 2014 results. He also noted that ChannelAdvisor shares traded "at a 32% discount to the comp group of SaaS companies. Our sense," Furby concluded, "as the company continues to execute, drive margin improvement, and raise forward numbers, its valuation should migrate toward the overall SaaS group, if not exceed it."

113. On December 18, 2014, ecommerce provider CommerceHub issued a press release, announcing its acquisition of Mercent, a retail technology company substantially similar to ChannelAdvisor. CommerceHub is a 99% owned subsidiary of the former Liberty Media, now Liberty Interactive whose "digital commerce" group, of which CommerceHub was a part, did over one billion in 2014 revenues. "Mercent," CommerceHub described, "helps large brand name retailers, including 1-800-Flowers, HSN and GUESS? profitably reach and convert online shoppers." According to CEO Frank Poore, CommerceHub "evaluated all the providers in this space and consulted a number of large retailers regarding their current solutions. Mercent stood out as the only combination of enterprise-scale platform and services that are ready for the caliber of retailers we support." Mercent founder and CEO, Eric Best, added, "[a]s one of the

fastest-growing ecommerce infrastructure providers, the company is on track to solve the complexities of omni-channel operations and marketing to keep retailers growing. CommerceHub will enable us to achieve our vision." Together, CommerceHub and Mercent claim that their platform handles $10 billion of retail GMV annually, integrating "with more than 200 enterprise retailers, all major North American marketplaces, and over 8,500 brands and distributors. . . , optimiz[ing] approximately 50 million unique product SKUs for data compliance, channel syndication and sales performance."

114. On December 24, 2014, William Blair analyst Justin Furby published a report about the CommerceHub takeover of Mercent, stating, "Mercent is probably the closest competitor to ChannelAdvisor, and the acquisition is therefore notable, although Mercent is a fraction of the size and appears more concentrated within the digital marketing category (i.e., search, PLAs, CSEs) and Amazon's (AMZN $305.19; Outperform) U.S. channel as opposed to ChannelAdvisor's emphasis on marketplaces." According to Furby, Mercent boasts 200 retailer customers who "run $2 billion of . . . GMV annually through its platform ($10 million on average per retailer) . . . ," boasting "somewhere between $12 million and $15 million" in revenue.

115. About the deal, Furby noted that "[f]rom ChannelAdvisor's perspective, we see both puts and takes to the acquisition, but on the whole we believe it illustrates the strategic nature of e-commerce optimization, and we believe it will send Mercent down a path that is more focused on digital marketing." Furby reported that he had recently spoken with CommerceHub management who expressed their interest "in Mercent's marketing and analytics assets as well as its enterprise services (we have heard that Mercent deployments involve a lot of

customization/services), rather than the marketplace business. Although digital marketing is a core tenant of ChannelAdvisor's offering," Furby continued, "its vision and much of its investment has been more focused around global marketplaces (e.g., Amazon, eBay, Mercado Libre, Tmall Global, Newegg, etc.)."

116. From this, Furby concluded that ChannelAdvisor and Mercent might be "heading down different paths, although we note that ChannelAdvisor often enters the door at large enterprise via its digital marketing technology, and we will be watching to see if this acquisition impacts its success in this market." Furby further noted that CommerceHub boasted "an impressive roster of retailer and brand customers including Best Buy, Kohl's, Sears, K-mart, Walgreens, Staples, Panasonic, Dell, GE, Coleman, and Harry & David. Several of these companies," Furby wrote, "have existing relationships with ChannelAdvisor, and although we doubt they would consider switching platforms following the acquisition, it is always a potential risk." Contradicting the Company's 2013 10-K statement about competition, Furby concluded "that ChannelAdvisor's competitive landscape remains largely wide open, and Mercent management affirmed this view, stating there are few viable vendors in the market."

117. On January 8, 2015, reporting on the merger for website *Markets Daily*, Jason Ford wrote that "Mercent is probably the closest competitor to ChannelAdvisor, and the acquisition is therefore notable, although Mercent is a fraction of the size and appears more concentrated within the digital marketing category and Amazon's U.S. channel as opposed to ChannelAdvisor's emphasis on marketplaces." Ford continued that Mercent's "200 retailer customers reportedly run $2 billion of gross merchandise platform (GMV) annually through its platform, compared with $4.4 billion of GMV that went through ChannelAdvisor's platform in

2013."

118. On January 13, 2015, analyst Brian Nichols of the premium subscription service *Tipping The Scale*, posted an article on the website *SeekingAlpha.com*, titled "Why ChannelAdvisor Might Have M&A Appeal." In this Article, Nichols recognized that ChannelAdvisor's customers "almost always outperform merchants and advertisers not using ChannelAdvisor's services." Notwithstanding the efficacy of its SaaS platform, the markets had punished the Company on January 13, 2015. The low stock price, coupled with the success of its product offering, Nichols wrote, "lead me to believe that ChannelAdvisor might very well have M&A appeal." With the quality of the Company's platform, he continued, Amazon.com might target ChannelAdvisor for acquisition. He stated that "[t]he problem is that besides a subscription model, ChannelAdvisor doesn't have a way to collect meaningful revenue, and the company has shown no indication that it can produce profits and significant revenue growth simultaneously. Therefore," he continued, "the prospects of a ChannelAdvisor acquisition is not necessarily to suggest that ECOM is a good investment behind its large losses. Instead," he concluded, "it suggests that the acquirer would be gaining a valuable asset at a cheap price that could accelerate overall revenue growth.

119. ChannelAdvisor had floundered during the second quarter of 2014. After announcing disappointing results, investors punished ChannelAdvisor, causing the stock to plummet by nearly 30% on relatively enormous volume of nearly 5.2 million shares traded. This coincides with CommerceHub's targeting a retail technology companies that assisted customers in selling across broad channels. Thus, positive results for the third quarter and for the all-important fourth quarter, with the holiday season, were critical to enhancing ChannelAdvisor's

stock price and potentially fending off an acquisition attempt by CommerceHub or others.

**No Safe Harbor**

120. ChannelAdvisor's "Safe Harbor" warnings accompanying its reportedly forward looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

121. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of ChannelAdvisor who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**Application Of Presumption Of**
**Reliance: Fraud On The Market**

122. Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(a) The omissions and misrepresentations were material;

(b) The Company's securities traded in an efficient market;

(c) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(d) Plaintiffs and other members of the Class purchased ChannelAdvisor securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

123. At all relevant times, the market for ChannelAdvisor securities was efficient for the following reasons, among others:

(a) As a regulated issuer, ChannelAdvisor filed periodic public reports with the SEC; and

(b) ChannelAdvisor regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**Applicability of Presumption**
**<u>of Reliance: *Affiliated Ute*</u>**

124. Neither Plaintiffs nor the Class (defined herein) need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is

necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**Loss Causation/Economic Loss**

125. The market for ChannelAdvisor securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, ChannelAdvisor securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired ChannelAdvisor securities relying upon the integrity of the market price of ChannelAdvisor securities and market information relating to ChannelAdvisor, and have been damaged thereby.

126. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of ChannelAdvisor securities and operated as a fraud or deceit on Class Period purchasers of ChannelAdvisor securities by misrepresenting the value of the Company's business and prospects by overstating its earnings and concealing the significant defects in its internal controls. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of ChannelAdvisor securities fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of ChannelAdvisor securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

127. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about ChannelAdvisor's business and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of ChannelAdvisor and its business and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing ChannelAdvisor securities at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of ChannelAdvisor securities was removed and the price of ChannelAdvisor securities declined dramatically, causing losses to Plaintiffs and the other members of the Class.

## FIRST CLAIM
## Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

128. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

129. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

130. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of ChannelAdvisor securities during the Class Period.

131. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ChannelAdvisor securities. Plaintiffs and the Class would not have purchased ChannelAdvisor securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SECOND CLAIM
## Violation of Section 20(a) of the Exchange Act
## Against the Individual Defendants

132. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

133. Plaintiffs, on behalf of the Class, sue the Individual Defendants herein as controlling persons of ChannelAdvisor. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, the Individual Defendants acted as control persons of ChannelAdvisor within the meaning of §20(a) of the Exchange Act, having the power to influence and control, and did influence and control, directly or indirectly, ChannelAdvisor's decision-making, including the content and dissemination of the various

statements that Plaintiffs contend are false and misleading. In particular, each Individual Defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

134. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of ChannelAdvisor and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. Those defendants exercised that power.

135. As set forth above, ChannelAdvisor violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by its misrepresentations and omissions as alleged in this Complaint

136. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

137. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchase(s) of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding rescission or a rescissory measure of damages; and

E. Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 27, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Jacob A. Goldberg*

Laurence M. Rosen
Jacob A. Goldberg
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: lrosen@rosenlegal.com
jgoldberg@rosenlegal.com
pkim@rosenlegal.com

***Lead Counsel for Plaintiffs and the Class***

**LEWIS & ROBERTS, P.L.L.C.**

By: */s/ Brooke A. Howard*
James A. Roberts, III
N.C. State Bar No. 10495
Brooke A. Howard
N.C. State Bar No. 36584
P. O. Box 17529 (27619)
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Telephone: 919-981-0191
Facsimile: 919-981-0199
Email: jar@lewis-roberts.com
bah@lewis-roberts.com

***Local Civil Rule 83.1 Counsel for Lead Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2015 I electronically filed the foregoing ***Consolidated Amended Class Action Complaint For Violation Of The Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

BY: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
E-M: jgoldberg@rosenlegal.com

***Lead Counsel for Lead Plaintiff and the Class***