IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:15-CV-00307-F

|  |  |  |
|---|---|---|
| In re CHANNELADVISOR CORP. Securities Litigation | ) ) ) ) ) | CLASS ACTION |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

This matter is before the court on Defendants ChannelAdvisor Corporation, Scot Wingo, David Spitz, and John Baule's ("Defendants") Motion to Dismiss Plaintiffs' Consolidated Amended Complaint [DE-50]. For the reasons that follow, the instant motion is ALLOWED.

### I. BACKGROUND

In this class action, Plaintiffs allege Defendants made false and misleading statements in violation of: (1) Section 10(b) of the Securities Exchange Act (the "Act") and Rule 10b-5 promulgated thereunder, and (2) Section 20(a) of the Act.

Section 10(b) of the Act makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 prohibits any person from "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). Under Section 20(a) of the Act,

individuals who "control" persons who are liable for violations of the Act are jointly and severally liable with the controlled person for those violations. 15 U.S.C. § 78t(a).

## A. ChannelAdvisor's Business

ChannelAdvisor offers its clients an online platform to facilitate product sales through a variety of Internet sites (e.g., eBay, Amazon). Compl. [DE-49] ¶ 2.[1] Rather than posting a product to multiple different websites, the client uploads all its product information through ChannelAdvisor. The benefit to the client is increased efficiency in its internal operations and greater exposure across the Internet.

ChannelAdvisor earns revenue by charging clients a commission on the amount of product (the gross merchandise value, or GMV) processed through its platform. *Id.* ¶ 2–3. Clients pay this commission based on a combination of fixed and variable subscription fees. *Id.* ¶ 3. Each client commits to a certain minimum GMV to be processed through ChannelAdvisor's platform. *Id.* This represents the fixed fee portion of the contract. Once that minimum has been met, the client pays commission at the variable fee rate on all excess GMV processed during the contract period. *Id.* The variable subscription rate is substantially higher than the fixed fee rate. *Id.*

Smaller clients typically choose contracts with a low GMV threshold so they can avoid large upfront capital commitments. *Id.* ¶ 4. As a result, they often end up paying more in the long run because the majority of their GMV processed is paid at the higher variable subscription rate. *See id.* Larger, better capitalized clients typically opt for a higher minimum GMV commitment, thereby paying the majority of their fees at the lower rate associated with fixed-fee subscriptions. *Id.*

---

[1] For purposes of a motion to dismiss under Rule 12(b)(6), the court assumes the truth of factual allegations in the plaintiff's complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

2

ChannelAdvisor discovered that it made more money from smaller customers paying variable subscription rates, but it experienced high rates of turnover with those small customers. *Id.* ¶ 5. That is, these small customers failed to renew their contracts year-to-year. This turnover, or "churn," worried investors and industry analysts. *Id.* Beginning in 2013, ChannelAdvisor began focusing its business on larger customers—the ones more likely to pay the majority of their commissions at the lower, fixed-fee subscription rate. *Id.* ¶ 6. The company hoped to make up for the lost variable subscription fees with larger volume. *Id.* It also hoped to benefit from the added stability of a customer base paying mostly fixed subscription fees. *Id.*

At the beginning of the fourth quarter of 2014, ChannelAdvisor issued a revenue forecast of $25.6 million to $26.1 million for the quarter, up from $20.5 million during the same period the prior year. *Id.* ¶ 8. ChannelAdvisor's stock rose from $12.20 to $17.85 per share the day after the company announced the projection. *Id.* ¶ 9. During the class period, ChannelAdvisor reached a high of $21.95 per share. *Id.* On January 13, 2015, when ChannelAdvisor announced that its revenues had not increased as much as projected, the stock dropped to a close of $9.83 per share. *Id.*

### B. The Allegedly False Statements

Plaintiffs point to two categories of statements they identify as false or misleading: (1) revenue projections and (2) risk disclosures.

In a November 6, 2014 press release, ChannelAdvisor predicted its fourth quarter 2014 revenue would be between $25.6 million and $26.1 million. *Id.* ¶ 65. ChannelAdvisor's Chief Financial Officer, Defendant Baule, repeated that forecast on the same day during the third quarter 2014 Earnings Call. *Id.* ¶ 66. On that call, ChannelAdvisor's President and Chief Operating Officer, Defendant Spitz, credited the forecasted revenue growth to the company's

3

focus on larger customers, and indicated that the increased reliance on fixed subscription rates allowed the company to more accurately predict its future revenues. *Id.* ¶ 67. On the same day, ChannelAdvisor filed its Quarterly Report (Form 10-K) with the SEC, including the following risk disclosure:

> [w]e have adopted a pricing model under which a portion of the subscription fees we receive from our customers is variable, based on the amount of our customers' GMV processed through our platform that exceeds a specified amount established by contract, which we refer to as variable subscription fees. . . . Substantially all of [the Company's] customer contracts include this variable subscription fee component. . . . If sales by our customers processed through our platform were to decline, or if our customers were to demand fully fixed pricing terms that do not provide for any variability based on their GMV processed through our platform, our revenue and margins could decline.

*Id.* ¶ 73.

Plaintiffs claim the revenue projections were false or misleading because ChannelAdvisor had clear visibility into its future revenue as a result of the shift to mostly fixed subscription fees. Indeed, Plaintiffs argue, ChannelAdvisor focused on the fixed fee model for this very reason. *Id.* ¶ 72. The fourth quarter, in particular, could be predicted with great accuracy because so few new customers are typically generated during that time of year. *Id.* ¶ 59–60. Thus, according to Plaintiffs, ChannelAdvisor must have known that its revenue projections were unrealistic. As for the risk disclosure, Plaintiffs argue it is misleading because it discloses, as a mere risk, circumstances ChannelAdvisor knew had already occurred—the shift to more fixed subscription fees. *Id.* ¶ 74.

## II. STANDARD OF REVIEW

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not to resolve conflicts of fact or to decide the merits of the action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). In considering a motion to dismiss, the

4

court assumes the truth of all facts alleged in the complaint and the existence of any fact that can be proved, consistent with the complaint's allegations. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). However, the "'[f]actual allegations must be enough to raise a right to relief above the speculative level' and have 'enough facts to state a claim to relief that is plausible on its face.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009) (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (second alteration in original) (citations omitted). Moreover, a court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts.*, 213 F.3d at 180.

### III. DISCUSSION

ChannelAdvisor argues Plaintiffs fail to state a claim under which relief can be granted. To state a Rule 10b-5 claim, a plaintiff must show: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Singer v. TranS1, Inc.*, No. 7:12-CV-00023-F, 2015 WL 2341907, at *6 (E.D.N.C. May 14, 2015). ChannelAdvisor argues Plaintiffs fail to adequately plead materiality, falsity, and scienter. Further, ChannelAdvisor argues that the statements in question are protected by the Private Securities Litigation Reform Act's ("PSLRA") Safe Harbor provision, and are therefore inactionable as a matter of law.

5

The court finds the materiality issue to be dispositive, and will therefore confine its discussion to that topic.

A statement or omission is material if there is "a substantial likelihood that a reasonable purchaser or seller of a security (1) would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003) (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999)). Thus, the inquiry is highly fact-specific. *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994).

In its motion to dismiss, ChannelAdvisor relies on *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993), for the rule that projections of future performance may be material only if they are worded as guarantees. Mot. Dismiss [DE-51] at 12. In fact, the Fourth Circuit in *Raab* observed that such projections are *generally* inactionable. *See Raab*, 4 F.3d at 290 (quoting *Krim v. Banctexas Grp., Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)). Thus, a strong presumption of immateriality for future performance projections seems to be the well-settled rule in the Fourth Circuit. *See, e.g., Hillson*, 42 F.3d at 209; *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994); *Raab*, 4 F.3d at 290.

### A. Revenue Projections

#### 1. Omission of material facts

Plaintiffs first argue that ChannelAdvisor provided misleading or false statements regarding its revenue projections. Plaintiffs point to district court cases in which the court has found future performance projections material. Plaintiffs' cited cases, however, relate not to affirmative statements, but to omission of information that should have been disclosed.

For example, in *City of Ann Arbor Employees' Ret. Sys. v. Sonoco Products Co. (Sonoco I)*, No. 4:08-CV-2348-TLW-TER, 2009 WL 2487045, at *3 (D.S.C. Aug. 14, 2009), the court concluded that the plaintiff's complaint survived a motion to dismiss where the defendant failed to disclose price concessions and the loss of a major customer when it released its annual forecasts. The plaintiffs there alleged disclosure would have "played a strong role in the deliberations of the reasonable investor," rendering the omission material. *Id.* (internal quotation marks omitted). The court noted that on the date the concessions came to light, the company's stock price dropped, but concluded that it lacked sufficient information at the Rule 12(b)(6) stage to determine the "effect of additional factors on this negative market reaction." *Id.*

Later, on the defendant's motion for summary judgment, the court again found the plaintiff's allegations sufficient. *City of Ann Arbor Employees' Ret. Sys. v. Sonoco Products Co. (Sonoco II)*, 827 F. Supp. 2d 559, 579 (D.S.C. 2011). Noting that materiality determinations are a "mixed question of law and fact that generally should be presented to a jury," the court concluded that the defendant's omission was not immaterial as a matter of law. *Id.* at 577. In reaching its decision, the court considered industry analysts' reactions once the price concessions were eventually revealed, as well as the subsequent drop in stock price. *Id.* at 578. The court observed that "*the public arguably remained unaware* that Sonoco was granting price concessions," and that the information came as a surprise to analysts. *Id.* at 578–79 (emphasis added).

Here, unlike in *Sonoco I* and *II*, the market (including industry analysts) was aware of ChannelAdvisor's shift toward larger customers. In fact, the company's shift was a reaction to analysts' concerns over churn. Compl. [DE-49] ¶ 5. Because ChannelAdvisor saw the greatest churn from its smaller customers, it chose to focus its business on attracting larger customers. *Id.*

7

As Plaintiffs concede, ChannelAdvisor "touted it[s] [anti-churn strategy] to analysts and investors." *Id.* ¶ 6.

A "reasonable investor" is "not necessarily a 'prudent' or 'conservative' investor." *Hillson*, 42 F.3d at 216 (quoting *Sec. & Exch. Comm'n v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)). Neither, however, should the court "attribute to investors a childlike simplicity." *Id.* at 213. Here, ChannelAdvisor clearly announced that it was shifting its focus to larger customers. And in its 2013 10-K, the company explained its pricing scheme, including that variable fees were generally higher than fixed fees.

Accordingly, the issue for the court is whether the "reasonable investor" would understand that a switch to larger customers necessarily entailed a greater reliance on fixed fees. The obvious conclusion is this: larger, better capitalized customers who process more product through ChannelAdvisor's platform would naturally gravitate toward a contract that, although it required a larger up-front commitment, reduced the amount paid overall. Thus, a focus on larger customers would inevitably lead to a shift toward more fixed-fee contracts. This is a fairly common pricing scheme for everyday services like cell phone and Internet usage plans, and a reasonable investor is likely to understand its ramifications. Just as a person who worries he will exceed his monthly Internet data cap will purchase the next tier of service to avoid astronomical surcharges, a company nearing its GMV threshold with ChannelAdvisor will likely do the same. The "reasonable investor" would understand this without being explicitly told. Thus, ChannelAdvisor laid all its cards on the table through its various statements and disclosures. No material information was omitted. *See, e.g., Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (holding there is no duty to disclose information already known to the market).

### *2. Affirmative Statements*

Plaintiffs argue that the revenue projections at issue here are "specific projections supported by specific statements of fact," unlike the soft, puffing statements found immaterial in *Raab* and *Hillson*. Opp. Mot. Dismiss [DE-54] at 28. In *Raab*, the defendant reported that it was "poised to carry the growth and success of 1991 well into the future." *Raab*, 4 F.3d at 289. In *Hillson*, the defendant forecast that "significant sales gains should be seen as the year progresses," that "1992 will produce excellent results," and that the company was "on target toward achieving the most profitable year in its history." *Hillson*, 42 F.3d at 212. In both cases, the Fourth Circuit found the statements too vague to be material.

Here, the revenue projections are more specific—ChannelAdvisor predicted Fourth Quarter revenue between $25.6 million and $26.1 million. Subjecting a company to liability for this type of prediction, however, would cut against the spirit of the Fourth Circuit's holding in *Raab* and subsequent cases. As the Fourth Circuit explained:

> Predictions of future growth stand on a different footing . . . because they will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Raab*, 4 F.3d at 290. District courts in this circuit have routinely held that predictions of a projected revenue range were not specific enough to constitute material statements. *See, e.g., Ash v. PowerSecure Int'l, Inc.*, No. 4:14-CV-92-D, 2015 WL 5444741, at *8–9 (E.D.N.C. Sept. 15, 2015) (holding that estimates of between $25 and $35 million annual revenue were "optimistic

expressions, not guarantees of future performance"); *Pipefitters Local No. 636 Defined Ben. Plan v. Tekelec*, No. 5:11-CV-4-D, 2013 WL 1192004, at *8 (E.D.N.C. Mar. 22, 2013) (finding immaterial revenue guidance predicting $470 to $480 million annual revenue). Thus, ChannelAdvisor's revenue forecast seems to be exactly the type of vague growth prediction found immaterial by the Fourth Circuit in *Raab*. Accordingly, Plaintiffs' claims with regard to ChannelAdvisor's revenue projections are DISMISSED.

### *B. Risk Disclosures*

Plaintiffs also allege that the risk disclosure accompanying ChannelAdvisor's revenue projections was false because it disclosed—as a mere risk—a condition the company knew already existed—the pronounced shift of its customer base to contracts with more fixed subscription fees.

Only one circuit court appears to have addressed the materiality of risk factor disclosures. In *Bondali v. Yum! Brands, Inc.*, the Sixth Circuit held cautionary statements inactionable "to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." 620 F. App'x 483, 491 (6th Cir. 2015) (quoting *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008)). According to that court, this is because of the "inherently prospective" nature of such disclosures, which "are not meant to educate investors on what harms are currently affecting the company." *Id.* Thus, the Sixth Circuit concluded that "a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on *future* harms." *Id.*

A few district courts have opined that a risk disclosure *may* be material in some limited circumstances, but this court has found no examples of such a case. In *FBR*, for example, the

10

United States District Court for the Southern District of New York found that a "boilerplate description of [the defendant company's] regulatory risks could not have been misleading to a reasonable investor as the description 'said nothing company-specific, and no reasonable investor would infer anything about the state of [the company's regulatory] compliance.'" 544 F. Supp. 2d at 362 (quoting *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 905 (N.D. Ill. 2001)) (second alteration in original). The implication seems to be that the court believed company-specific risk disclosure statements—like those arguably contained in the instant case—*might* be material. *But cf. In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 836 (N.D. Cal. Aug. 21, 2014) *reconsideration denied*, No. 5:13-CV-01920-EJD, 2014 WL 7146215 (N.D. Cal. Dec. 15, 2014) (holding inactionable a defendant company's cautionary statements about its potential tort liability where the company had omitted information about then-pending lawsuits ("Rule 10b-5 does not contain a 'freestanding completeness requirement' because '[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not.'") (alteration in original)).

Here, the court sees no reason to differentiate ChannelAdvisor's risk disclosures from those held inactionable by the Sixth Circuit and numerous district courts. The salient inquiry for materiality, regardless of the type of statements at issue, is the effect of the information on the reasonable investor. Here, after explaining the company's pricing structure, ChannelAdvisor warned that if customers demanded fully fixed pricing, revenues could decline. This is exactly the type of disclosure discussed by the Sixth Circuit in *Bondali*. Like in that case, it is unlikely that a reasonable investor would, from that cautionary language, infer anything about ChannelAdvisor's current contracts.

11

Accordingly, Plaintiffs' claims with regard to ChannelAdvisor's risk disclosure are DISMISSED. Further, because no underlying Rule 10b-5 claims survive, Plaintiffs' Section 20(a) "control person" claims must also be DISMISSED. *See, e.g., Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 552 (M.D.N.C. Aug. 14, 2013) ("On a motion to dismiss, a Section 20(a) claim will stand or fall based on the court's decision regarding the Section 10(b) claim.").

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss [DE-50] is ALLOWED. All claims against Defendants are DISMISSED. The Clerk of Court is DIRECTED to close this case.

SO ORDERED.

This, the 6th day of April, 2016.

*James C. Fox*
JAMES C. FOX
Senior United States District Judge